FILED
2015 Jul-23 PM 03:45
U.S. DISTRICT COURT
N.D. OF ALABAMA

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
### NORTHEASTERN DIVISION

| | | |
|---|---|---|
| GARY THACKER AND<br>VENIDA L. THACKER, | ) <br> ) <br> ) | |
| Plaintiffs, | ) <br> ) | |
| v. | ) <br> ) | Civil Action No.:_____ |
| TENNESSEE VALLEY AUTHORITY, | ) <br> ) | |
| Defendant. | ) | |

## COMPLAINT

Gary Thacker and Venida L. Thacker, Plaintiffs in the above-styled cause, complain of the Defendant as follows:

### PARTIES

1. Plaintiff Gary Thacker is an adult resident citizen of Limestone County, Alabama.

2. Plaintiff Venida L. Thacker is an adult resident citizen of Limestone County, Alabama, and is the wife of Gary Thacker.

3. Defendant Tennessee Valley Authority (TVA) was created by the Tennessee Valley Authority Act of 1933, Pub. L. No. 73-17, 48 Stat. 58 (1933) (Preamble); 16 U.S.C. § 831. The purposes of the TVA Act were to improve navigability and to provide for flood control of the Tennessee River, reforestation and proper use of marginal lands in the Tennessee Valley, and agricultural and industrial development. The Act also empowered TVA to dispose of surplus power generated as incident to navigation and flood control. *See* 16 U.S.C. §§ 831(i); 831(h)(1). Congress "intend[ed] that [TVA] shall have much of the essential freedom and

elasticity of a private business corporation." H.R. Rep. No. 130, 73d Cong., 1st Sess., at 19 (1933). TVA has used this flexibility and independence to become a substantial commercial enterprise. TVA is the largest public power company in the United States and operates one of the largest electric power systems in North America, supplying electric power to more than 8.6 million customers in parts of seven states. In 2005, TVA spent approximately $6.5 billion to operate its power system, which generated approximately $7.8 billion in annual revenues. These revenues are kept by the TVA to support its further corporate enterprises, and it is only required to pay a portion of its revenues to the United States Treasury. Thus, TVA is an independent corporation with nearly complete autonomy from direction and oversight of the U.S. government, and any judgment against it is not paid out of U.S. Treasury funds. For that reason Congress has specifically excepted TVA from the auspices of a suit against the United States, and the TVA may sue and be sued in its corporate name. *See* 16 U.S.C. § 831c(b).

## JURISDICTION AND VENUE

4. This Court has original jurisdiction over this action pursuant to Congressional waiver of suit against TVA under 16 U.S.C. § 831c(b).

5. Venue is proper in this district under 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to this claim occurred in this district and division, specifically in Limestone County, Alabama.

## FACTS

6. For many years, TVA had a uniformed patrol division commonly referred to as "the TVA Police." While the TVA Police existed, they patrolled boat traffic on the Tennessee River. This work patrolling boat traffic on the Tennessee River involved the use of official TVA Police boats equipped with blue strobe lights and sirens and public address units. In 2012,

however, TVA made the decision to eliminate the TVA Police as part of a restructuring process. The planned and calculated dissolution of the TVA Police occurred at a time when the TVA Police had 61 uniformed officers. Rather than continue to employ these 61 uniformed officers and allow them to continue to patrol boat traffic on the Tennessee River with officially marked police boats equipped with blue strobe lights, sirens, and public address capability, the TVA chose to eliminate the entire TVA Police including all 61 of these officers. As a poor replacement for these 61 officers and their marked police boats, TVA made the decision to turn over some of their duties to contractors and/or use electronic surveillance, and to then depend on local law enforcement for the rest of their duties. As one local law enforcement official said at the time TVA made this announcement in 2012, "This is a decision made by folks a long way from here that don't have any personal contact with the community. If you lived here, worked here, and cared for the area, you wouldn't do this." As of this time in 2012, therefore, TVA knew that it had substantially weakened its ability to properly and effectively patrol boat traffic on the Tennessee River. TVA also would have known that this weakened ability to patrol boat traffic on the Tennessee River could be an even more important factor in the event that an emergency situation of some kind was created on or around the Tennessee River. For that reason, TVA should have instituted heightened and stringent criteria for contractors to qualify to perform boat patrol activities and should have instituted and/or required training for contractors in the proper procedures to patrol boat traffic on the Tennessee River in the event of any emergency situation.

7. In early July of 2013, TVA began replacing old conductors on the Trinity-Browns Ferry 161 kV transmission lines that crossed the waters of the Tennessee River with new conductors. The work required use of a puller, a tensioner, and a pulling cable. As this work

continued, TVA determined that a larger puller was needed. This new puller was procured on July 25, 2013. The new puller had a maximum working force of 40,000 pounds and a manually set safety limit of 22,000 pounds. The rated tensile strength of the pulling cable was greater than 50,000 pounds.

8. On July 30, 2013, TVA was replacing the last of three phase conductors on the Trinity-Browns Ferry 161 kV transmission line. TVA personnel were using the pulling cable to pull a running board that had the three phase conductors attached to the other side of the board across the river.

9. On information and belief, TVA had contracted with the owner/operator of two boat crews that were patrolling the Tennessee River while the overhead work was being performed. Neither boat was marked with any official TVA or government markings. Neither boat was equipped with blue lights, sirens, or public address capability. "Boat One" was designated with patrolling on the southern shore of the River to the River's midpoint; and "Boat Two" was designated with patrolling on the northern shore of the River to the River's midpoint. On information and belief, the only warning device associated with these two boats was one orange flag.

10. At approximately 2:40 p.m., the pulling cable failed, thereby allowing the new conductor to fall into the Tennessee River. This conductor stretched between the nearest two power line towers, with the central most part of the conductor partially looping down into the water. The area where the conductor contacted the water was in the channel used by most boat traffic.

11. TVA knew that the conductor looping down into the channel of the Tennessee River created a dangerous situation. TVA knew it did not have trained and experienced TVA

Police to patrol the area. TVA knew that both commercial boat traffic and recreational boat traffic would be traveling on the Tennessee River on a sunny July afternoon. TVA knew, or certainly should have known, that a recreational fishing tournament would begin approximately five miles to the east in approximately three hours. TVA knew it did not have enough patrol boats. TVA chose to not bring in additional patrol boats to monitor the situation and protect the public.

12. Instead, the TVA expanded the patrol area of Boat One and Boat Two in a misguided attempt to keep recreational boats from coming into contact with the downed line, requiring both crews to patrol the entire width of the River, with Boat One on the east side of the downed line, and Boat Two on the west side of the downed line. If anything, this decision by the TVA diluted the already inadequate ability of Boat One and Boat Two to patrol the channel where the conductor contacted the water.

13. TVA did not take any steps to mark the downed conductor and/or the area of the channel in which the conductor hung with any warning flags, markers, or buoys of any kind.

14. The Tennessee River is approximately 1.25 miles wide in the area where the downed conductor contacted the river. The channel is an area approximately 100 yards wide. The downed conductor was partially submerged in this channel.

15. Thus, while Boat One and Boat Two were charged with patrolling the entire width of the River, there was only a 100 yard wide area that needed to be patrolled. This area was where the hazard existed and where most boat traffic could be expected.

16. Late that afternoon, a recreational fishing tournament began approximately five miles upstream on the Tennessee River to the east, launching out of Ingalls Harbor. This fishing tournament was held every Tuesday as a fun, recreational fishing activity. Gary Thacker

5

participated in the tournament with his fishing partner Anthony J. Szozda, as they had done many times before, and the two launched from Ingalls Harbor at approximately 5:30 p.m. along with several other boats participating in the tournament.

17. Approximately 5 minutes after the tournament started, which was approximately three hours after the conductor fell into the water, Thacker and Szozda were traveling west on the Tennessee River on their way to one of their favorite fishing holes. They were never warned of the downed line, either before they launched their boat at Ingalls Harbor or after they were on the water. They were never stopped by Boat One or Boat Two; never saw any warning flags, buoys, or markers either on the line or in the water; and never saw Boat One or Boat Two in the channel where the conductor created the hazard to their lives and safety. In fact, Boat One and Boat Two were not even in the area.

18. The TVA workers were trying to raise the conductor at the same time Thacker and Szozda arrived in the area. The conductor was raised slightly just before they were about to go over it. Instead of being able to pass safely over it, therefore, the TVA conductor struck their boat, hit Szozda in the neck, nearly decapitating him and killing him instantly, and striking Thacker in the head and torqueing his body about. Thacker suffered serious physical injuries that resulted in surgical intervention to repair damage to his spine.

19. Boat Two, which was on the far side of the conductor from Thacker's path of approach, arrived near Thacker after the fact of the collision with the conductor. Boat One, which was on the side of the conductor from which Thacker approached, failed to even attempt to stop Thacker's boat prior to the collision. The pilot of Boat Two, upon seeing the essentially decapitated Szozda in the boat, called 911. He then instructed Thacker to drive his boat back to

Ingalls Harbor, approximately 5 miles away. Thacker made this entire drive with his essentially headless friend's body still in the boat with him.

20.     Investigators inspected the area where the collision happened at approximately 7:45p.m., more than two hours after the fatal event and five hours after the conductor fell into the water. TVA had still failed to place any warning flags, emergency markings, or buoys on the downed conductor or in the water. Even after it knew of Szozda's death and Thacker's injuries, TVA did nothing to prevent any similar harm happening to anyone else.

21.     TVA failed to properly qualify the contractors and/or employees that worked on this job; failed to properly plan for emergency situations like the situation that was created by its contractors and/or employees; failed to properly investigate the qualifications and/or training of its contractors and/or employees; failed to properly train its contractors and/or employees; failed to properly instruct its contractors and/or employees in how to respond to the emergency and protect the public; and failed to properly supervise its contractors and/or employees in their response to the emergency and the inadequate steps taken to protect the public.

22.     As a proximate result of TVA's conduct, Thacker has suffered severe personal injuries necessitating surgical intervention, reasonable and necessary medical bills, extreme emotional distress and mental anguish, and loss of enjoyment of life in the past, and anticipates that he will continue to suffer from these injuries and conditions in the future and for the rest of his life.

23.     As a proximate result of TVA's conduct, Venida L. Thacker has suffered loss of consortium damages because she has had to provide nursing services and care to her husband which otherwise would not have been necessary and because she and Mr. Thacker have not been able to have and enjoy the normal and healthy relationship they previously enjoyed as husband

and wife, both because of the physical limitations that have plagued Mr. Thacker and because of the severe mental and emotional distress and anguish with which he now lives.

## COUNT ONE

### NEGLIGENCE

24. Plaintiffs adopt all preceding paragraphs and incorporate them by reference as if fully set forth herein.

25. TVA owed a duty to exercise reasonable care in the assembly and installation of the power lines across the Tennessee River. TVA also had a duty to exercise reasonable care in warning boaters on the Tennessee River of the hazards it created.

26. TVA breached the above duties.

27. TVA's negligence was a direct and proximate cause of Plaintiffs' injuries.

WHEREFORE, Plaintiffs request for a verdict against Defendant Tennessee Valley Authority in an amount sufficient to fairly and reasonably compensate them for the harm caused by the wrongful conduct of Tennessee Valley Authority.

## COUNT TWO

### WANTONNESS

28. Plaintiffs adopt all preceding paragraphs and incorporate them by reference as if fully set forth herein.

29. TVA owed a duty to exercise reasonable care in the assembly and installation of the power lines across the Tennessee River. TVA also had a duty to exercise reasonable care in warning boaters on the Tennessee River of the hazards it created.

30. TVA wantonly breached the above duties.

31. TVA's wantonness was a direct and proximate cause of Plaintiffs' injuries.

WHEREFORE, Plaintiffs request for a verdict against Defendant Tennessee Valley Authority in an amount sufficient to fairly and reasonably compensate them for the harm caused by the wrongful conduct of Tennessee Valley Authority and in an amount sufficient to preserve life, punish the defendants, protect the public, and prevent similar wrongs in the future.

Respectfully submitted on this, the 23rd day of July, 2015.

/s/ Gary V. Conchin
Gary V. Conchin
Attorney for Plaintiff

/s/ Kenneth B. Cole, Jr.
Kenneth B. Cole, Jr.
Attorney for Plaintiff

OF COUNSEL:

CONCHIN, CLOUD & COLE, LLC
2404 Commerce Court, SW
Huntsville, AL 35801
Phone: (256) 384-7777
Fax:     (256) 384-7770
Email: gary@conchincloudcole.com
Email: kenny@conchincloudcole.com

## JURY DEMAND

Plaintiffs demand a trial by struck jury.

/s/ Gary V. Conchin
Gary V. Conchin

/s/ Kenneth B. Cole, Jr.
Kenneth B. Cole, Jr.

## SERVICE

Please serve Defendant via certified mail as follows:

Office of General Counsel
Sherry Quirk
Executive Vice President and General Counsel
Tennessee Valley Authority
400 W. Summit Hill Drive
Knoxville, TN 37902