FILED
2020 Dec-14  PM 05:58
U.S. DISTRICT COURT
N.D. OF ALABAMA

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
### NORTHEASTERN DIVISION

**GARY THACKER AND
VENIDA L. THACKER,**

      **PLAINTIFFS,**

**V.**                            **CASE NO. 5:15-CV-01232**

**TENNESSEE VALLEY AUTHORITY,**

      **DEFENDANT.**

## PLAINTIFFS' BRIEF IN SUPPORT OF OPPOSITION TO TENNESSEE VALLEY AUTHORITY'S MOTION FOR SUMMARY JUDGMENT

### TABLE OF CONTENTS

INTRODUCTION ............................................................ 1

EVIDENCE SUPPORTING PLAINTIFFS' OPPOSITION ........................... 3

UNDISPUTED FACTS ........................................................ 3

ARGUMENT ................................................................ 9

  I.      TVA did not even provide this Court with the testimony of
          Brad Cox because it was so devastating ...................... 10

  II.     The Alabama Recreational Use Statue (ARUS) does not apply
          To the commercial activity of TVA ........................... 12

  III.    Because the ARUS does not apply to commercial activity of TVA,
          Plaintiffs are not charged with the burden of showing actual
          knowledge of the elements outlined in Ala. Code § 35-15-24 .... 15

  IV.    Plaintiffs are not burdened with proving "actual knowledge," but
          TVA admittedly had a duty to guard or warn against the downed

line and breached said duty ........................................................ 16

V.      TVA argues that the ARUS charges landowners like TVA with
        the duty owed to licensees, but TVA can and should be held liable
        to a licensee when someone is injured by a downed power line.. 22

VI.     Under admiralty law, this case is subject to a comparative fault
        analysis, and therefore, is not like a typical Alabama contributory
        negligence analysis ...................................................................... 25

CONCLUSION .............................................................................. 27

## INTRODUCTION

This case involves a boating collision directly resulting from TVA's commercial activities related to maintenance of its transmission lines. The United States Supreme Court has ruled in this case that the TVA's Sue and Be Sued Clause renders it "liable to the same extent as a private party" when its "conduct is commercial- the kind of thing any power company might do."[1] Here, the TVA's normal line maintenance activities resulted in the company dropping transmission lines into the main river channel of the Tennessee River. The TVA then positioned one of its boats to warn the boating public about the downed line and to guard against the boating public coming into contact with the line. The TVA decided this boat would abandon its warning and guard position, so a second TVA boat was supposed to assume this position. However, the second TVA boat failed to assume the guard/warning position, and the first TVA boat still negligently and willfully abandoned the guard position, knowing full well that it had not been replaced in this crucial role.[2] These decisions resulted in the line not being guarded by either TVA boat and Mr. Thacker not being warned about the line at the crucial moment his boat came through the hazardous area. TVA owned the downed transmission line and had a duty to warn and guard against such a hazard. TVA was in complete

---

[1] *Thacker v. Tennessee Valley Auth.,* 139 S. Ct. 1435, 1444 (2019).
[2] The first TVA boat which guarded where the line entered the water was piloted by Mark Anderson and will be referred to as "Anderson's boat." The second TVA boat which was supposed to assume the guard position will be referred to as "Carman's boat."

control of the safety and security decisions related to the downed line. TVA even admits, for purposes of its Motion for Summary Judgment, that it "had actual knowledge … the reconductor work posed an unreasonable risk to users of the Reservoir."[3]

As a result of TVA's choice not to guard or warn about a hazard it admits was "an unreasonable risk to users of the Reservoir," one of those users, Plaintiff Gary Thacker, was seriously injured, and Mr. Szozda was killed after almost being decapitated.

This Court must deny TVA's Motion for Summary Judgment. First, TVA does not acknowledge to this Court the crucial testimony of TVA employee, Brad Cox. By this purposeful omission, TVA misleads the Court. Second, case law offered by TVA is distinguishable and the Alabama Recreational Use Statute ("ARUS") does not apply to this commercial activity of TVA. Third, because the ARUS does not apply to commercial activity of TVA, Plaintiffs are not charged with the burden of showing actual knowledge of the elements outlined in Ala. Code § 35-15-24 of the ARUS. Alternatively, disputed issues of material fact exist regarding TVA's actual knowledge of those elements. Fourth, the facts show that

---

[3] See TVA's Brief in Support of its Motion for Summary Judgment (Doc. 98), p. 25, n.23 (citing Ala. Code § 35-15-24(a)(1), (2)). See also id at p. 26, n. 24 ("TVA does not dispute the first and second element of the exception in regard to Plaintiffs' claim concerning TVA's warnings to boaters. Ala. Code § 35-15-24(a)(1), (2)").

the downed line in the river was a hazard that was known to TVA, and that TVA had a duty to guard the unmarked hazard and warn recreational boats (or any river traffic) of its existence. Additionally, once it assumed the duty to guard/warn, TVA was required to fulfill that duty in a non-negligent fashion. Fifth, TVA can and should be held liable to a licensee when someone is injured by a downed power line. Sixth, under admiralty law, this case is subject to a comparative fault analysis and is not like a typical Alabama contributory negligence analysis. Therefore, Plaintiffs win if TVA is 51% at fault. Last, TVA's exhibits to its Brief are objectionable and do not support summary judgment.

## EVIDENCE SUPPORTING PLAINTIFFS' OPPOSITION

Plaintiffs submit the following exhibits in support of their Opposition to TVA's Motion for Summary Judgment:

1. Exhibit 1 – Deposition of Lewis Brown
2. Exhibit 2 – Deposition of Shane Carman
3. Exhibit 3 – Deposition of Adam Ruddle
4. Exhibit 4 – Deposition of Mark Anderson
5. Exhibit 5 – Deposition of Brad Cox
6. Exhibit 6 – Deposition of Billy Gibson
7. Exhibit 7 – Deposition of Plaintiff Gary Thacker
8. Exhibit 8 – Department of Conservation and Natural Resources Boating Accident Investigation Report
9. Exhibit 9 – TVA's Diagram of the Collision Scene
10. Exhibit 10 – Affidavit of Clayton Allen Terry
11. Exhibit 11 – Witness Statement of Justin Poole
12. Exhibit 12 – Deposition of Doug Overby

## UNDISPUTED FACTS

Plaintiffs do not dispute TVA's facts as they generally describe TVA's Trinity Line, the width of the Reservoir where the Trinity Line crosses the Reservoir, or that TVA is the fee owner of the inundated land at the Trinity Line, including where the transmission towers are located. Plaintiffs also agree that in July 2013, TVA began to replace the overhead conductors on the Trinity Line, and that TVA was in the process of replacing these lines around 2:40 pm on July 30, 2013, when a pulling cable broke and the lines fell into the river.[4]

The line was down in the main river channel for about 3 hours before the collision occurred (Ex. 2 at 129: 7-12; Ex. 3 at 36:17-23, 37: 1-9; Ex. 4 at 39: 14-23, 40: 1-2; Ex. 5 at 17: 8-23, 18: 1-11, 19-22: 1-23 and 27-30: 1-23). TVA admits, for purposes of its Motion for Summary Judgment, that it "had actual knowledge … the reconductor work posed an unreasonable risk to users of the Reservoir."[5] Plaintiffs submit the following additional undisputed facts from deposition

---

[4] There is a dispute as to how many places the line was in the river. TVA argues that the line "sagged into the waters of the Reservoir in three places---between towers 46 and 47, between towers 47 and 48, and between towers 48 and 49." See TVA's Brief (Doc. 98), p. 14. Plaintiffs dispute this, at least at the crucial time the collision actually occurred. The dropped transmission line was down into the river in the main river channel (it drooped down between other towers, but was actually in the water only between the towers where the main river channel was located) (Ex. 1 at 27-28: 2-20; Ex. 3 at 42: 5-9; Ex. 4 at 79: 5-23; Ex. 5 at 15-16, 30-32)). Plaintiffs acknowledge that Carman testified the line was in the water in locations other than the main river channel. However, the great weight of the believable evidence is that it was in the water only in the main channel at the time of the collision.

[5] See Doc. 98, p. 25, n.23 (citing Ala. Code § 35-15-24(a)(1), (2)). See also id at p. 26, n. 24 ("TVA does not dispute the first and second element of the exception in regard to Plaintiffs' claim concerning TVA's warnings to boaters. Ala. Code § 35-15-24(a)(1), (2)").

testimony of TVA employees and Plaintiff Gary Thacker, the scene diagram, and

the police investigation reports:

a.    TVA produces electricity (Ex. 12. at 29: 5-8.);

b.    TVA serves a 7-state area in the southeast United States
       (*Id.* at 30: 9-14.);

c.    One of TVA's functions is to produce and sell electricity
       in this 7-state geographical area (*Id.* at 30:15-22.);

d.    Producing and selling electricity is one of TVA's major
       functions (*Id.* at 30: 23; 31: 1-4.);

e.    TVA sells electricity to local power distributors like
       Florence Utilities and to direct-serve customers which
       typically are industrial customers (*Id.* at 31: 5-22.);

f.    TVA directly or indirectly provides electricity to
       approximately 10 million people (*Id.* at 32: 12-17.);

g.    Once TVA produces electricity, it transmits that electricity from
       plants to switch yards, after which the electricity is distributed
       across a system of electrical transmission lines such as the lines
       crossing the Tennessee River where this event occurred (*Id.* at
       33: 4-22.);

h.    TVA's work on the Tennessee River at this crossing in July,
       2013, was a maintenance process of the TVA pulling new
       transmission lines across the river in that location (*Id.* at 33: 23;
       34: 1-5.);

i.    TVA's ESS department played a role in this job (*Id.* at 34: 6-
       11.);

j.    The two boat pilots, Shane Carman and Mark Anderson, were
       part of TVA's ESS department (*Id.* at 34: 12-16.);

k.   The new transmission lines that TVA was pulling across the river were part of the transmission system that TVA uses to get electricity from point A to point B (*Id*. at 35: 20-23; 36: 1-2.);

l.   TVA has competitors like Southern Company in this geographical region, and TVA has agreements referred to as "interconnects" with these other companies by which these other power companies can transfer electrical power back and forth over the transmission lines (*Id*. at 37: 6-21.);

m.   So, sometimes TVA is transmitting electricity which was produced by TVA, and sometimes TVA is transmitting electricity which was produced by other power companies (*Id*. at 38: 5-22.).

n.   The TVA boat, piloted by Anderson, was "parked" in the main river channel in front of where the line went into the river (location #1) and was therefore "blocking" or warning any recreational boats from running into the line (this location is where the bass boat later hit the line) (Ex. 4 at 44: 21-23; 45: 1-23; 46: 1-23; 47: 1-20) (Ex. 5 at 16: 21-23; 17: 1-7) (Ex. 9 with Position #1 marked by witness).

o.   Anderson's boat was initially guarding the downed line from recreational boats colliding with it (Ex. 4 at 30: 20-23; 31:1-2) (Ex. 5 at 16: 21-23; 17: 1-7) (Ex. 1 at 34: 2) (Ex. 2 at 203: 18-23; 204: 1-11);[6]

p.   As TVA was beginning to "pull" the line out of the river, they realized the pulling board was hung up and preventing the "pull" out of the river from being successful,[7] so Cox asked/ordered that Anderson's boat be moved north into position #2 so Cox could see what was happening up in the towers. (Ex. 4 at 37: 4; 18: 1-11) (Ex. 5 at 19: 2-23; 20: 1-23; 21: 1-23; 22: 1-3);

[6] Anderson confirmed that his boat never had to leave this #1 guard position to intercept any boats in other locations. (Ex. 4 at. 45: 21-23; 46: 1-4). Cox confirmed this fact. (Ex. 5 at 17: 8-23; 18: 1-11).

[7] Plaintiffs believe the best evidence is that the line was only in the main river channel once this "pull" of the dropped line had begun.

q.   Anderson's boat therefore guarded and/or warned against the hazard from about 2:40 to 5:15 or about 2 hours and 35 minutes out of the three hours the line was in the water before the collision. This means the line was unguarded and lacking warning for about 20-25 minutes just prior to the collision. (Ex. 5 at 27: 18-23; 28: 1-23; 29: 1-23; 30: 1-7);

r.   Cox asked/ordered that Anderson's boat be relocated about 1300-1400 feet north of the original location #1, and this new position is what the witnesses and the scene diagram call location #2 (Ex. 4 at 73: 17-23; 74: 1-19; 75: 1-14) (Ex. 5 32: 12-20) (and Ex. 9);

s.   Before Anderson's boat moved into position #2, Cox called and talked with the people on Carman's boat, who confirmed Carman's boat would move into and replace Anderson's boat in position #1, thereby becoming the boat that was "guarding" the downed line from recreational boats hitting it (Ex. 5 at 22: 4-23; 23: 1-23; 24: 1-8; 55: 21-23; 56: 1-23; 57: 1-2);

t.   However, Carman's boat did not replace Anderson's boat in position #1, and Anderson's boat still left position #1; and a few minutes later, Thacker's bass boat collided with the unguarded and unmarked downed line (Ex. 5 at 59: 21-23; 60: 1-16);

u.   Abandonment of the guard position by Anderson's boat and/or failure of Carman's boat to assume the guard position is particularly crucial because TVA had not taken any steps to mark the downed line with markers such as fluorescent orange flags or buoys to warn Plaintiff or other boaters about this hazard. In fact, TVA witnesses and investigating police officers agree the downed line was completely unmarked and that this fallen and unmarked power line was a contributing factor to the collision in question (Ex. 3 at. 25: 11-23; 26: 1-23; 27: 12-23; 28: 1-11) (Ex. 1 at 22: 8-23; 23: 1-8; 24: 23; 25: 1-22; 26: 2-6). In fact, Officer Larry Adams even indicated that the "Accident Contributing Factors" were limited to "Unmarked water hazard." Ex. 6 at page 2;

7

v.    The bottom line is that Anderson's boat should not have left position #1 unguarded, so they should have waited until Carman's boat got there to replace them. Said another way, Anderson's boat never should have left position #1 when they did because Carman's boat was not there yet. In fact, Cox admitted that he expected Carman's boat to serve that safety function when Anderson's boat moved to position #2 (Ex. 5 at 63: 1-5);

w.    Plaintiff Gary Thacker's testimony shows that he did not see the downed line until it hit the front pole seat of his boat, at which point, he immediately "let out of the gas." (Thacker Dep. at 183: 5-13; 185: 9-15);

x.    TVA employees testified that their personal recreational boats did not have marine radios and/or they know that recreational boats in general do not have marine radios. (Ex. 3 at 19-21) (Ex. 5 at 49: 5-23; 50- 1-20; 51: 13-15) (Ex. 6 at 27: 17-23; 28: 1-9; 29: 15-18; 30: 10-16);

y.    TVA could have but did not ask any of the other available sources of boats (e.g., more TVA ESS boats, the Marine Police or the local sheriffs' departments) for assistance which they could have provided when the line fell. (Ex. 3 at 116: 3-23; 117: 8-20; 125: 20-23; 126: 1-12) (Ex. 6 at 114: 11-15; 115: 5-13) (Ex. 2 at 172: 7-23; 173: 1-18);[8]

z.    The Department of Conservation and Natural Resources Boating Accident Investigation Report correctly states: "the line was completely unmarked, with no markings in the water to warn him of the line. An inspection of the area at approximately 1945, revealed no water buoy markings, as well as no markings on the power line." Ex. 8 at p.1;

---

[8] Cox testified that he flagged one marine police boat down to warn him a couple hours before the collision occurred, but that the marine police boat did not hang around and Cox did not call anyone higher up in TVA to ask them to call the marine police or officially ask for help. (Cox Dep. 65: 13-23; 66: 1-19).

aa.  TVA employee Adam Ruddle testified that from where he was
on the north shore, he could not "tell where the line was at. [He]
didn't know if it was underwater…" (Ex. 3 at 151: 5-7)
Ruddle's testimony also explains that he "went to discuss the
situation with his Supervisor, Stacy Sockwell near the puller."
(Ex. 3 at 154: 6-8) Additionally, Ruddle pinpointed Sockwell's
location about a mile from the main river channel when he
testified as follows: "…I'm walking back up to where my boss
Stacy Sockwell is which is about a 4,000 foot walk." (Ex. 3 at
156: 4-7);

bb.  Carman admitted that he "do[es] believe [he] was patrolling the
entire west side of that conductor, the transmission line that
day, and not just a portion...And...we're patrolling the entire
from bank to bank, that's [his] recollection for the whole day."
(Ex. 2 at 90: 14-22); and

cc.  Carman patrolled the West side of the transmission line while
Anderson patrolled the East side of the transmission line. (Ex. 2
at 90: 14-22) (Ex. 4 at 38: 1-12; 40: 3-18; 43: 2-23) (Ex. 5 at
32: 12-23; 33: 1-14).

## ARGUMENT

TVA's Motion for Summary Judgment must be denied because genuine, triable

issues of material fact exist. *Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986).

When considering whether any genuine disputes of material fact exist, the Court

must view the evidence in the light most favorable to the non-moving party and

draw reasonable inferences in favor of the non-moving party. *White v. Beltram*

*Edge Tool Supply, Inc.*, 789 F.3d 1188, 1191 (11th Cir. 2015). A trial court has the

discretion "to deny even a well-supported motion for summary judgment, if it

believes the case would benefit from a full hearing." *United States v. Certain Real*

& *Pers. Prop. Belonging to Hayes*, 943 F.2d 1292, 1297 (11th Cir.1991); *see also Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 255 (1986) (recognizing that a trial court has discretion to "deny summary judgment in a case where there is reason to believe that the better course would be to proceed to a full trial") (citation omitted); *Thomas v. Imerys Carbonates, LLC,* 1:17-cv-01258-KOB, 2018 WL 6446651, at *1 (N.D. Ala. Dec. 10, 2018) (quoting *Evans v. Books-A-Million,* 762 F.3d 1288, 1294 (11th Cir. 2014) ("genuine issues [of material fact] are those in which the evidence is such that a reasonable jury could return a verdict for the non-movant."). The biggest indication that TVA knows such fact issues exist is that TVA has not even attempted to deal with the sworn admissions of its former employee Brad Cox.

## I. <u>TVA did not even provide this Court with the testimony of Brad Cox because it was so devastating.</u>

TVA's complete omission of Brad Cox's testimony is a purposeful attempt by TVA to not disclose to the Court the most important and significant liability evidence in the lawsuit which TVA cannot overcome. TVA's failure to even mention the testimony of Brad Cox should lead this Court to deny TVA's Motion for Summary Judgment. His tearful testimony and admissions show there are genuine issues of material fact requiring a full trial.

Cox and Anderson testified they were guarding/warning by sitting in the main river channel in front of the downed line (Ex. 4 at 44: 21-23; 45: 1-23; 46: 1-23;

47: 1-20) (Ex. 5 at 16: 21-23; 17: 1-7). Cox then testified that when he needed to ask Anderson's boat to move north, he also talked to Carman's boat about replacing them in this guard/warning position; but that Anderson's boat moved north 1300 feet out of the guard/warning position even though Carman's boat had not arrived to replace them. (Ex. 5 at 22: 4-23; 23: 1-23; 24: 1-8; 55: 21-23; 56: 1-23; 57: 1-2; 59: 21-23; 60: 1-16). TVA purposefully has not even told the Court about this crucial testimony. TVA knows these admissions constitute substantial evidence that TVA chose "not to guard or warn"[9] of the downed line in the crucial moments before the collision. TVA simply has dishonestly failed to disclose Cox' testimony to the Court. Based on the crucial admissions of Cox and Anderson, TVA knows its employees made a conscious decision to neither guard nor warn of the downed line at the time Plaintiff's boat came through the area. (Ex. 4 at 73: 17-23; 74: 1-19; 75: 1-14) (Ex. 5 at 27: 18-23; 28: 1-23; 29: 1-23; 30: 1-7; 32: 12-20). TVA additionally argues that Plaintiffs cannot prove that TVA engaged in "[c]onduct which is carried on with a reckless or conscious disregard of the rights or safety of others"[10] to win on wantonness. However, TVA cannot seriously make that argument without ignoring Cox. TVA knows, but has failed to disclose Cox knew Carman's boat needed to guard/warn when Anderson's boat left the

_____

[9] See Doc. 98, p. 27.
[10] See id. at p. 18 (citing Ala. Code § 6-11-20(b)(3)).

guard/warning position. (Ex. 5 at 63: 1-5). It was because of this knowledge that he

talked with Carman's boat and asked it to replace Anderson's boat in that position,

but he still ordered Anderson's boat to move north 1300 feet with full knowledge

that Carman's boat had not replaced them.  (Ex. 5 at 22: 4-23; 23: 1-23; 24: 1-8;

55: 21-23; 56: 1-23; 57: 1-2; 59: 21-23; 60: 1-16). Those facts constitute the very

definition of reckless or conscious disregard.

## II.    The Alabama Recreational Use Statute (ARUS) does not apply to the commercial activity of TVA.

TVA wants this Court to believe, incorrectly, that the ARUS applies to TVA's

commercial activity at issue in this case. TVA heavily relies upon its

misapplication of *Clark v. Tennessee Valley Auth.*,[11] to make this argument. TVA

also ignores the holding of the United States Supreme Court in this case that the

TVA can be sued for its commercial conduct just like any other power company. In

*Clark,* the Court explained that, "Sections 35–15–20 through 28, Code of Ala.

(1975) (1984 Supp.) *applies to noncommercial public recreational landowners*

such as defendants and provides them with even tighter limitations than §§ 35–15–

1 through 5, as to their exposure to liability to recreational users." *Clark*, 606 F.

Supp. 130, 131 (N.D. Ala. 1985) (emphasis added). The conduct in *Clark*,

---

[11] See *id.* at p. 21 ("[Article 2] applies to noncommercial public recreational landowners such as [TVA] and provides them with even tighter limitations than [Article 1] as to their exposure to liability to recreational users" (citing Clark, 606 F. Supp. at 131)).

however, was the existence of a dam and its spillway. The purposes of the dam and its spillway, of course, were to control and prevent flooding. The control of flooding has long been recognized as one of the governmental functions of the TVA. The *Clark* opinion cited by TVA is distinguishable from the case at hand. *Clark* involved claims relating to the defendants' alleged failure to warn plaintiff of the safe distance for a boat to maintain in relation to a dam's spillway over which plaintiff's boat fell while he was fishing in the reservoir after paying a fee for issuing plaintiff a permit to fish there. See *Clark*, 606 F.Supp at 131. In fact, the Tennessee Valley Authority Act of 1933 provides that one purpose of the TVA is "to control the destructive flood waters in the Tennessee River and Mississippi River Basins…" 16 U.S.C. § 831. However, the United States Supreme Court, in a unanimous ruling in this lawsuit, held that Plaintiffs had a right to sue the TVA for its commercial activities just as if it was any other utility company transmitting and selling electricity. See *Thacker v. Tennessee Valley Auth.,* 139 S. Ct. 1435 (2019). The U.S. Supreme Court noted that "the TVA sometimes resembles a government actor, sometimes a commercial one." *Thacker*, 139 S. Ct. 1435, 1443 (2019). The Court stated that eminent domain and arresting individuals are governmental actions. However, the Court made it very clear that "in other operations—and over the years, a growing number—the TVA acts like any other company producing and supplying electric power." *Id.* The Court clarified that "if the conduct is

13

commercial—the kind of thing any power company might do—the TVA cannot invoke sovereign immunity. In that event, the TVA's sue-and-be-sued clause renders it liable to the same extent as a private party." *Id.* at 1444. Utility companies are liable when they fail to properly warn about or guard dangerous lines. As an example from a comparative fault jurisdiction, power companies "must anticipate and guard against events which may be reasonably expected to occur, and its failure to do so is negligence…" *Mississippi Power and Light Co. v. Shepard,* 285 So.2d 725, 729 (Miss. 1973). The *Shepard* opinion "reaffirmed the rule that a public utility company must place its wires so they are not dangerous to persons or property. It is the continuing duty of the utility company to maintain its wires over streets and highways [so] they will not become dangerous to persons and property." *Mississippi Power Company v. Luter,* 336 So.2d 753, 756 (Miss. 1976). It should not matter if the line goes across a road or across a river. See *infra* at page 23-24.

As the trial court recognized in *Clark*, the ARUS sections cited by TVA apply to "noncommercial" public recreational landowners. Sections of the ARUS, which apply to "noncommercial" public recreational landowners,[12] do not apply to TVA's commercial activities here because the U.S. Supreme Court says so. Here, TVA was maintaining its lines "like any other company producing and supplying electric

---

[12] See Doc. 98 at p.28, discussing Ala. Code § 35-15-20.

power." Because the U.S. Supreme Court has ruled that TVA can be sued like any

other power company with respect to its commercial activities, TVA can be sued

here. Sections 35-15-20 and -22 are not applicable. Plaintiffs are not claiming TVA

failed to warn/guard a boater from a hazardous condition which naturally existed

on the Tennessee River, or from governmental activity such as controlling flood

waters with an obviously existing dam and spillway. This situation involves TVA

artificially creating a hazardous situation by dropping the line in the river and

leaving it unmarked and unguarded for approximately 20-25 minutes just before

the collision. Unlike the dam in *Clark*, this line was never supposed to be in the

river and it served a commercial purpose.

### III.   <u>Because the ARUS does not apply to commercial activity of TVA, Plaintiffs are not charged with the burden of showing actual knowledge of the elements outlined in Ala. Code § 35-15-24.</u>

As TVA admits, "Article 2"[13] applies to "noncommercial public recreational

landowners." *Clark,* 606 F. Supp. at 131. Section 35-15-24, which TVA cites as

the "narrow exception" to the ARUS's limitation of liability[14] falls within Article

2. Because Article 2 does not apply to commercial activity of TVA, as outlined in

the previous section of this Brief, the four elements outlined in Section 35-15-24

(a) do not apply. Additionally, the case law cited by TVA regarding constructive

---

[13] <u>See</u> Doc. 98, p. 20.
[14] <u>See</u> *id.* at pp. 22-23.

versus actual knowledge does not apply.[15] This means that Plaintiffs are not

charged with the burden of proving TVA's "actual knowledge" of the elements in

35-15-24(a). Alternatively, there are disputed fact issues regarding whether TVA

actually knew the line was not apparent to boaters. TVA admits it parked

Anderson's boat in front of the downed line in Position #1 to warn boaters of the

line and prevent them from running into it. The only reason for this decision is

TVA's actual knowledge the line was not apparent. Cox even admitted they

stopped a Marine Police boat to warn him about the line. If TVA knew it was not

apparent to the Marine Police, then TVA knew it was not apparent to the other

boaters. Cox also admitted he asked Carman's boat to take over Position #1, an

unnecessary action unless TVA knew the line was not apparent. Furthermore, TVA

employees in both boats tried to intercept the bass boats, an obvious indication

TVA knew the line was not apparent. Also, a fact issue exists concerning whether

witnesses Terry and Poole saw the line before or only after the collision. Terry's

Affidavit says he did not see the line until after the collision,[16] and Poole's

attached witness statement says the following: "We were following their boat, we

were probably 40 yards behind their boat and watched them come to an abrupt

---

[15] See _id._ at p. 23, n.21 ("Constructive knowledge of these four elements is not sufficient; it must be actual knowledge. _See Martin v. City of Gadsden_, 584 So.2d 796, 797-98 (Ala. 1991); _Dauphin Island_, 274 So.3d at 250; and Ala. Code § 35-15-24(b)").

[16] See Ex. 10.

stop. When they stopped suddenly, we were at their boat in probably about two or three seconds. Thacker started screaming "it cut his head off!" We saw where there was a line in the water." [17]

### IV.   Plaintiffs are not burdened with proving "actual knowledge," but TVA admittedly had a duty to guard or warn against the downed line and breached said duty.

TVA admits its real duty to Plaintiffs: "[I]f, however, there is a dangerous condition on Wheeler Reservoir of which TVA has actual knowledge, TVA has a duty to warn or to guard against that condition."[18] This statement is a judicial admission against TVA's interest because TVA also had actual knowledge the reconductor (maintenance) work posed an unreasonable risk to Thacker,[19] and created this dangerous condition through its own commercial activities.  Plaintiffs should not have to prove TVA had "actual knowledge" that the downed line was not apparent to persons like Plaintiff Gary Thacker as the above principles make the TVA's arguments at pages 25-26 of its Brief irrelevant.[20]

Additionally, TVA's argument that the Court need not engage in a fact specific reasonableness or effectiveness inquiry into TVA's warnings or guarding efforts[21]

---

[17] See Ex. 11.

[18] See Doc. 98 at p. 24.

[19] See *id.* at p. 25, n. 23 (wherein TVA stated: "…TVA does not dispute that TVA had actual knowledge the reconductor work posed an unreasonable risk to users of the Reservoir. Ala. Code § 35-15-24(a)(1),(2).").

[20] See *id.* at pp. 25-26 (wherein TVA presents an argument claiming Plaintiffs must prove TVA had actual knowledge the downed line was "not apparent" to persons like Plaintiff Gary Thacker).

[21] See *id.* at pp. 28-29.

makes no sense. TVA appears to argue the ARUS completely immunizes TVA

from liability, and that is certainly not the effect of ARUS.  TVA acknowledges an

owner with actual knowledge of a hazard is required to take action to guard or

warn; but says taking any such action is legally sufficient.[22]  TVA cites *Clark;* but

in *Clark*, TVA factually placed warning signs.[23] However, in this case, TVA

initially warned/guarded with Anderson's boat;[24] then asked Carman's boat to

warn/guard when they had to leave the area;[25] but then abandoned the

guard/warning position before the other boat got there.[26] Therefore, this case is

completely factually distinguishable from *Clark*. Additionally, once TVA assumed

the duty to guard and warn about the hazardous line by placing Anderson's boat in

front of it, TVA had to fulfill this assumed duty in a non-negligent fashion. "As a

general principle "[w]hen one voluntarily assumes a duty he is bound to perform it

with care and if done negligently, he is liable for damages resulting from such

negligence." *Noonan Const. Co., v. Fed. Barge Lines, Inc.,* 453 F.2d 637, 640

(quoting *Stauffer Chem. Co. v. Brunson*, 380 F. 2d 174, 182 (5th Cir. 1967)).

---

[22] See *id.*
[23] See *id.* at p. 29 (quoting *Clark*, 606 F. Supp. at 131).
[24] See Ex. 4 at 30: 20-23; 31:1-2; Ex. 5 at 16: 21-23; 17: 1-7; Ex. 1 at 34: 2-8 ; Ex. 2 at 203: 18-23; and 204: 1-11.
[25] See Ex. 5 at 22: 4-23; 23: 1-23; 24: 1-8; 55: 21-23; and 56: 1-23; 57: 1-2
[26] See Ex. 5 at 59: 21-23; and 60: 1-16

TVA confirms it had 2 boats patrolling the river for this job.[27] However, other TVA boats could have been available for the job and/or could have been made available to respond to the hazardous condition that TVA created when it dropped the line in the river.  Some testimony indicates TVA had other boats that could have possibly responded.  Some testimony indicates that TVA never asked any of the other available sources of boats (e.g., the Marine Police or the local sheriffs' departments) for assistance which they could have provided. (Ex. 3 at 116: 3-23; 117: 8-20; 125: 20-23; 126: 1-12) (Ex. 6 at 114: 11-15; 115: 5-13) Ex. 3 at 172: 7-23; 173: 1-18). Therefore, TVA could have satisfied its duty to guard or warn by other means but failed to do so.

TVA describes a series of general steps it was taking to warn boaters of the general work it was doing.[28]  However, those steps are irrelevant because what TVA did and how TVA did it BEFORE it dropped the line has nothing to do with what TVA did and what TVA should have done AFTER it dropped the line. The fact that TVA burdens the Court with such an amount of irrelevant evidence, combined with TVA's complete omission and disregard for the crucial admissions by Brad Cox proves again TVA's unfortunate desire to mislead this Court. TVA

---

[27] See _id._ at p. 3.

[28] See _id._ at pp. 12-13 (wherein TVA outlines its warnings to boaters of the work they were doing, warnings which included: 1. Notifying the Corps it would be working on the Trinity Line, 2. TVA ESS personnel support boats patrolling the area of the Trinity Line to guard and warn boats of the work going on overhead, and 3. equipping ESS boats with orange flags, and boat horns).

cannot explain its decision to abandon the guard position before Carman's boat arrived to replace Anderson's boat.

Additionally, TVA asking the Coast Guard to make an announcement over marine radio[29] does not satisfy TVA's duty to warn or guard. TVA knew the Coast Guard announcement over the marine radio would reach commercial boat traffic with such radios but would not reach bass fishing boats without such radios. The police investigation report even confirms Plaintiff's boat, like other recreational boats, did not have a marine radio.[30] Also, numerous TVA employees confirmed their personal recreational boats did not have marine radios and/or they knew that recreational boats in general do not have marine radios. (Ex. 3 at 19-21.) (Ex. 5 at 49: 5-23; 50- 1-20; 51: 13-15) (Ex. 6 at 27: 17-23; 28: 1-9; 29: 15-18; 30: 10-16). Thus, TVA's warning over marine radio was essentially useless when it comes to recreational boats.

Similarly, TVA employee Carman asked the bridge operator and lockmaster to restrict boat traffic.[31] However, Carman admitted that he knew that lowering the bridge was not a complete guard to boats entering the area AND that he knew some boats would be entering the area from positions between the lowered bridge span and the area of the down line. (Ex. 2 at 97: 19-23, 98:1-10). This is where the

---

[29] See *id.* at p. 15.
[30] See Ex. 8.
[31] See Doc. 98. at p.14.

fishing boats came from. TVA, therefore, breached its duty to warn or stop any such boats by lowering the bridge.

TVA discusses the process of Carman's boat trying to intercept the fishing boats from a location near the north shore and someone on Carman's boat waving an orange flag.[32]  There was a long distance from where the TVA boat was located to where the collision occurred. Gary Thacker testified that the TVA boats, when he first saw them after the accident, were "at least three-quarters of a mile to a mile away." (Ex. 7 at 189: 4-10). He further clarified that they were on the north bank and it took about a minute and a half to two minutes to get to him. (Ex. 7 at 189: 16-23). Cox had asked Carman's boat to assume the guard/warning position that Cox/Anderson were abandoning but it did not despite assurances it would. (Ex. 5 at 22: 4-23; 23: 1-23; 24: 1-8; 55: 21-23; 56: 1-23; 57: 1-2). Since Plaintiff was so far from the TVA boats at the time of collision, it makes sense he did not see the one flag Carman was supposedly waving, and the fact that no boat was actually guarding or warning boats of the downed line, demonstrates that TVA breached its duty to guard or warn.

TVA argues that Poole and Terry (other fishermen behind Thacker's boat) saw the line in the water before Thacker hit it (and therefore Thacker should have seen it).  It is undisputed that Plaintiff Gary Thacker says he did not see the downed line

---

[32] See *id.* at pp. 16-17.

until it hit the front of his boat. (Ex. 7 at 183: 5-13, 185: 9-15). He is the only

person who can say what he actually saw. Further, the Department of Conservation

and Natural Resources Boating Accident Investigation Report  states: "the line was

completely unmarked, with no markings in the water to warn him of the line. An

inspection of the area at approximately 1945, revealed no water buoy markings, as

well as no markings on the power line." (Ex. 8 at p. 1). Additionally, Clayton Allen

Terry, one of the fishermen behind Plaintiff's boat, signed an Affidavit which

states as follows: "[a]lthough I saw a large power line in the water, I did not see it

until after Mr. Thacker and Anthony ran into it. Although Justin Poole stopped our

boat, he did not do so until after Mr. Thacker and Anthony had collided with the

line. No one was guarding the downed line, and we did not realize it was there

until after the collision had occurred." See Terry Affidavit, Ex. 10. Additionally,

Poole's witness statement, taken on the date of the accident, indicates that "We

were following their boat, we were probably 40 yards behind their boat and

watched them come to an abrupt stop. When they stopped suddenly, we were at

their boat in probably about two or three seconds. Thacker started screaming "it cut

his head off!" We saw where there was a line in the water." See Poole Witness

Statement, Ex. 11. This also demonstrates that TVA breached its duty to guard or

warn.

**V.**    <u>**TVA argues that the ARUS charges landowners like TVA with the duty owed to licensees, but TVA can and should be held liable to a licensee when someone is injured by a downed power line.**</u>

Alabama courts have determined power companies are liable to nonemployees for personal injury or property damage from exposure to sagging or downed power lines. For example, the Alabama Supreme Court says a boy who came in contact with an electric wire which had fallen to the ground because of an intersection collision could successfully sue Alabama Power based upon the following allegations: the wires were charged with dangerous quantities of electricity, the pole and the wires it supported were in close and dangerous proximity to the street, and the charged wires were weak and unsafe, which condition was known or reasonably should have been known to the power company. *Alabama Power Co. v. Guy,* 206 So.2d 594 (Ala. 1967). The Alabama Supreme Court rejected Alabama Power's contention that the negligence of the motorists was the intervening proximate cause of the child's injuries and that the Complaint did not show concurring negligence on the part of the company. The Court affirmed and stated that Alabama Power had a legal duty to keep the wires from falling on or near the public. *Id* at page 599.

In another case, Alabama Power was liable when a decayed tree limb fell on its power line, causing the wire to hang close to the street so as to cause an automobile to turn over and fatally injure the decedent. *Alabama Power Co. v. Jackson,* 166

So.692 (Ala. 1936). The Court found there were fact issues for the jury to decide whether the power company breached its duty to properly inspect and maintain its transmission line in a safe condition so as not to injure persons or damage their property while they were traveling on streets along which the line proceeded, and whether the defendant had notice of the condition of the limb and the danger to the line. *Id.*

While Alabama case law is scarce with respect to power companies being held liable to a licensee when someone is injured by a downed power line, case law from other states is persuasive to show that TVA can and should be held liable to a licensee injured by a downed power line.[33] Further, the United States Supreme Court has held in this case that TVA can be sued just like any other power company for its commercial activities. *Thacker v. Tennessee Valley Auth.,* 139 S. Ct. 1435 (2019).

TVA argues that the ARUS charges landowners like TVA with "the duty owed to licensees."[34] However, as the case law presented above supports, TVA, in dropping its transmission line, should still be held liable to Plaintiff Gary Thacker

---

[33] See e.g., *Connell v. Keokuk Elec. Ry. & Power Co.*, 109 N.W. 177 (Iowa 1906) (the defendant was liable for the decedent's death, having known of the dangerous condition of the wire, and that persons were in the habit of going near the place of danger, although the plaintiff's intestate was a bare licensee or trespasser on a property owner's land when he was killed by coming in contact with the defendant electric company's electric wire extending across the land, where the wire had been allowed to sag and where the insulation was worn off). See also, discussion of Mississippi cases, *supra* at page 14.

[34] See TVA's Brief (Doc. 98) at p. 20, n.16 and accompanying text.

for his injuries suffered as a direct result of TVA's conduct. TVA has admitted for purposes of its motion for summary judgment that "the reconductor work posed an unreasonable risk to users of the Reservoir."[35] Therefore, this admission by TVA is analogous to the *Guy* case in that TVA knew of the hazard of the downed line, which can go to support a finding of negligence/wantonness by TVA. Additionally, this supports the idea that TVA owed a duty to guard or warn of the wires, like the power company in *Guy* had a duty to keep the wires from falling on or near the public. Further, this shows a factual dispute as to whether TVA was maintaining its transmission line in a safe condition, which is analogous to the *Jackson* case. Further, since TVA was engaged in the commercial activity of maintaining the line when the collision occurred, Plaintiffs can sue TVA just like any other power company engaged in commercial activity, as shown in the *Thacker* opinion. Therefore, summary judgment is improper.

## VI.    <u>Under admiralty law, this case is subject to a comparative fault analysis, and therefore, is not like a typical Alabama contributory negligence analysis.</u>

TVA generally alleges Thacker was travelling too fast [36] and thereby implies Thacker should lose. However, applicable principles of admiralty law require a comparative fault analysis, not the Draconian application of Alabama's

---

[35] <u>See</u> *id.* at p. 25, n.23.
[36] Doc. 98 at p. 32.

contributory negligence doctrine. "With admiralty jurisdiction comes the application of substantive admiralty law. Absent a relevant statute, the general maritime law, as developed by the judiciary applies." *See East River S.S. Co. v. Transamerica Delaval,* 476 U.S. 858, 864 (1986). That said, "comparative negligence always applies over contributory negligence." *Williams ex rel. Breaseale v. Coleman Co., Inc.*, No. 4:11–cv–02384–RBP, 2014 WL 713376 at 1 (N.D. Ala. Feb. 24, 2014) (citing *Pope & Talbot v. Hawn*, 346 U.S. 406 (1953)). *Pope & Talbot*, 346 U.S. 406 (1953) further provides:

> "The harsh rule of the common law under which contributory negligence wholly barred an injured person from recovery is completely incompatible with modern admiralty policy and practice. Exercising its traditional discretion, admiralty has developed and now follows its own fairer and more flexible rule which allows such consideration of contributory negligence in mitigation of damages as justice requires. Petitioner presents no persuasive arguments that admiralty should now adopt a discredited doctrine which automatically destroys all claims of injured persons who have contributed to their injuries in any degree, however slight."

*Id.*at 408-09. Comparative fault is a characteristic feature of admiralty law and a substantial right. *See United States v. Reliable Transfer Co, Inc.,* 421 U.S. 397 (1975); *Pope & Talbot,* 346 U.S. at 408–09 (1953); *Lewis v. Timco, Inc.,* 716 F.2d 1425, 1428 (5th Cir.1983). Comparative negligence applies to maritime torts. *See Pope & Talbot,* 346 U.S. at 408–09 (1953). "Federal maritime law has adopted pure comparative negligence; therefore, a plaintiff's negligence, when constituting less than 100% of the combined fault, may only be considered in

mitigation of damages and not as a complete bar to recovery." *Johnson v. Carnival Corp.*, 07-20147-CIV, 2007 WL 9624457, at *3 (S.D. Fla. Dec. 11, 2007) (citing *Kermarec v. Compagnie Generale Transatlantique*, 358 U.S. 625, 627 (1959)).

TVA argues that Plaintiff Gary Thacker allegedly failed to "keep a proper look out while going too fast for the conditions" and that this was "the proximate cause of the July 30, 2013 accident."[37] Admiralty law applies. Therefore, comparative fault applies to TVA's conduct. Factually, there admittedly is not a speed limit on the river; bass boats routinely travel fast in the main river channel; this line being dropped by TVA in the river was an unusual occurrence (the first time that most of the TVA employees and Plaintiff had ever encountered it); TVA had acknowledged the day before that this hazard could occur and had planned on how to deal with it (i.e. TVA had superior knowledge about this possibility than Plaintiff had); and TVA knew within minutes before the collision that it was warning/guarding the hazard and was about to abandon that warning/ guarding duty, but had arranged for another TVA boat to undertake the warning/ guarding, yet left before the other boat arrived. Therefore, comparative fault applies in this case against TVA and no bar to recovery based on alleged contributory negligence exists. Damages should be allocated based on pure comparative fault, which requires a full hearing on the parties' relative conduct.

---

[37] See *id.* at p. 32.

## CONCLUSION

For the foregoing reasons, TVA's Motion for Summary Judgment should be denied.

Respectfully submitted this 14th day of December 2020.

/s/*Kenneth B. Cole, Jr.*
Kenneth B. Cole, Jr. (ASB-0595-C56K)
Attorney for Plaintiffs

/s/*Gary V. Conchin*
Gary V. Conchin (ASB-1263-C56G)
Attorney for Plaintiffs

OF COUNSEL:

CONCHIN COLE & JORDAN
2404 Commerce Court
Huntsville, Alabama 35801
Telephone: (256) 705-7777
Facsimile: (256) 705-7778
gary@alainjurylaw.com
kenny@alainjurylaw.com

## CERTIFICATE OF SERVICE

I hereby certify that on the 14th day of December 2020, I have served a copy of the above and foregoing on counsel for all parties by U.S. Mail and/or the Court's ECF filing system which will send notice of this filing to all counsel of record.

David D. Ayliffe
Lane E. McCarty
Ibrahim M. Berro
Mark A. Mohr

TVA GENERAL COUNSEL'S OFFICE
400 West Summit Hill Drive
Knoxville, Tennessee 37 902-1 401
Telephone 865 .632.4239

/s/ Kenneth B. Cole, Jr.
Attorney for Plaintiffs